IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CYNTHIA JEAN SCHMITZ, | ) | 4:18CV3074 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff brings this suit to challenge the Social Security Commissioner's final administrative decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.[1] For the reasons discussed below, the Commissioner's decision will be reversed and the case will be remanded for further proceedings.

## I. PROCEDURAL BACKGROUND

Plaintiff is currently 37 years old. In her application for SSI disability benefits, which was filed on February 5, 2015, Plaintiff claimed a disability onset date of June 1, 2013 (Filing 14-5, pp. 2).[2] She indicated her disability was caused by multiple sclerosis ("MS") and possible heart problems (Filing 14-6, p. 6).

Plaintiff's application was denied initially on April 20, 2015 (Filing 14-3, pp. 2-11; Filing 14-4, pp. 4-12), and upon reconsideration on June 5, 2015 (Filing 14-3, pp. 12-21; Filing 14-4, pp. 16-24). Following these denials, Plaintiff requested an administrative hearing (Filing 14-4, pp. 25-27). David G. Buell, an administrative law judge ("ALJ"), conducted a hearing on April 24, 2017. Plaintiff was represented by counsel and testified at the hearing.

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Title XVI.

[2] Plaintiff has a protective filing date of December 16, 2014 (Filing 14-6, p. 2).

Testimony was also provided by a vocational expert, Stephen Kuhn. *See* Transcript (Filing 14-2, pp. 46-80).

The ALJ issued an unfavorable decision on July 25, 2017 (Filing 14-2, pp. 18-37). Using the 5-step sequential analysis prescribed by Social Security regulations,[3] the ALJ made the following findings:

> 1.    The claimant has not engaged in substantial gainful activity since December 16, 2014, the application date (20 CFR 416.971 *et seq.*) (Exh. 11E/01; 14E/01).

> 2.    The claimant has the following severe impairments: multiple sclerosis and degenerative disc disease of the cervical spine (20 CFR 416.920(c)).

> 3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

> 4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except the claimant can occasionally stoop, kneel, crouch, and crawl. The claimant can perform work that does not require exposure to sustained, concentrated hot, and cold temperature, vibration, fumes, or dust. The claimant can perform work that does not expose the claimant to hazards, such as climbing ladders, work at unprotected heights, or operating motor vehicles. The claimant would require the use of a cane but was able to continue the normal job duties, including the lifting and carrying of objects.

> 5.    The claimant has no past relevant work (20 CFR 416.965) (Exh. 4D/01).

---

[3] *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (quotation and citation omitted)).

6. The claimant ... was 33 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 16, 2014, the date the application was filed (20 CFR 416.920(g)).

(Filing 14-2, pp. 23-33 (discussion under paragraphs 3, 4, 5, and 9 omitted)).

On August 8, 2017, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Social Security Administration (Filing 14-4, pp. 77-78). The request for review was denied on March 29, 2018 (Filing 14-2, pp. 5-10). The ALJ's decision thereupon became the final decision of the Commissioner. *See Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008).

Plaintiff commenced this action on May 29, 2018 (Filing 1), after obtaining an extension of time from the Appeals Council (Filing 14-2, pp. 2-4). The Commissioner filed an answer (Filing 13) and the administrative record (Filing 14) on November 14, 2018, after obtaining an extension of time from the court (Filing 12).

On December 12, 2018, Plaintiff filed a motion for an order reversing the Commissioner's decision (Filing 16) and a supporting brief (Filing 17). On January 14, 2019, the Commissioner filed a cross-motion for affirmance (Filing 18) and a supporting brief (Filing 19). Plaintiff filed a reply brief (Filing 20) on January 28, 2019, and the matter is now ripe for decision. *See* General Order No. 2015-05, *In the Matter of Procedures for Social Security Cases* (Filing 4).

## II. ISSUES

Plaintiff argues the ALJ's decision should be reversed, and the case remanded, because (1) the ALJ failed to consider at the third step of the sequential analysis whether Plaintiff's multiple sclerosis met or equaled Listing 11.09, (2) the ALJ failed to develop the record and erroneously relied upon his own lay judgment and an outdated state agency opinion to reject the treating sources' opinions, (3) the ALJ's step-4 residual functional capacity ("RFC") finding failed to include all of Plaintiff's limitations, and (4) the ALJ was not properly appointed under the Constitution to hear and decide the case (Filing 17, p. 1). The Commissioner disputes Plaintiff's first three arguments and contends Plaintiff forfeited her Appointments Clause claim by failing to raise the issue at any point in the administrative proceedings (Filing 19, p. 1).

## III. MEDICAL RECORDS

Arthur Weaver, D.O., the state agency medical expert who reviewed Plaintiff's medical records on April 14, 2015, made the following findings of fact:

> AOD is 6/1/13; POD is 12/16/14. Claimant asserts to have had MS x 10-11 years; however, no there was no confirmation of that. Claimant is currently pregnant. She last delivered 11/5/13. At 1/10/14 follow-up there was no mention of any NMSK issues, nor at 1/25/14 exam for a toe laceration. Brain MRI 3/4/14 showed some demyelinating lesions suspicious for MS, which is reasonable EOD in the event of an allowance. There is insufficient evidence to determine claimant's condition from AOD to EOD. At 8/11/14 Community Hospital (CH) visit for urinary & BM issues, TS states claimant "was never definitely diagnosed with MS". TS initiated evaluation, but claimant "left before (TS) could complete current evaluation" and "did not return".[4] Claimant was seen in ER 9/20/14 for an URI. She is on no MS medication, and "has not seen a neurologist in two years". Exam showed "equal strength and movement in upper and lower extremities bilaterally". At 11/3/14 McCook Clinic (MC) exam 11/3/14 claimant presented with a cane, reporting balance issues with some weakness. Exam showed UE & LE

---

[4] Plaintiff was seen at the McCook Clinic on August 11, 2014, by David J. Powell, PA-C (Filing 14-7, p. 48). The lab work was completed on August 14, 2014 (Filing 14-7, p. 45). The physician's assistant diagnosed Plaintiff with a lower urinary tract infection and prescribed medication (Filing 14-7, p. 44).

strength remained equal and symmetric. At 11/14/14 MC recheck claimant "feels well with minor complaints" (balance and vision, related to MS). Exam noted a "normal gait".[5] At 11/19/14 Neurology Associates exam she reports intermittent general weakness with climbing and walking most notable for a "few months"; however, "she did not seek medical attention". Eye exam was normal with no visual field deficit. VA 20/70 OD; 20/40 OS. Motor strength was normal in lower arms. In LE strength was 4/5 with some decreased vibratory sensation. Gait was unsteady, but no ataxia. Conservative management due to 10 weeks pregnant. 11/28/14 C & T-spine MRI reveals demyelination plaques. By 12/6/14 NA recheck she had no new changes. She still felt off balance, but TS notes "gait is stable" and balance was "currently improving". No aphagia or dysarthria. US strength remains 5/5; RLE 4 5, LLE 4+/5 with reduced temperature sensitivity. Impression is relapsing-remitting MS. NA entry 12/15/14 states "her symptoms have been stable". At 1/11/15 NA exam there are no new changes and her numbness was "improved", and "overall motor strength has improved", with LE strength now 5/5 except RT hip & foot. NA records 2/9/15 state "her leg weakness is stable". Claimant additionally implies she is disabled due to cardiac issues. At 11/19/14 NA visit she had no palpitations or difficulty breathing. CH notes 12/2/14 that claimant had been on metoprolol, but quit 6-8 weeks ago with "no problems since she stopped". EKG was NSR with no changes from previous. P=76. Further, "stress EKG showed no abnormalities". This allegation is not MDI. Claimant appears to have had a flare of MS in 2014, but recently shows improvement with conservative therapy. The extent of some limitations in ADLs appear greater than anticipated from recent MER. With regular medical care, claimant appears currently likely capable of activity listed on RFC.

(Filing 14-3, p. 5).

The following summation of Plaintiff's medical records appears as part of the ALJ's step-four analysis of Plaintiff's RFC:

In terms of the claimant's alleged multiple sclerosis and degenerative disc disease, on March 4, 2014, the claimant had an MRI of the brain and

---

[5] Plaintiff reported symptoms included "vision disturbances, limb weakness and loss of balance (numbness); associated symptoms included urinary incontinence and difficulty concentrating"; Plaintiff indicated "the disease has been worsening" (Filing 14-7, p. 42). On examination by David Powell, PA-C, Plaintiff had generalized muscle weakness and impaired coordination walking on her heels; it was his impression that the March 4, 2014 brain MRI showed changes consistent with active MS (Filing 14-7, p. 43).

orbits before and after IV contrast that found "multiple bilateral white matter hyperintense foci, some of which enhance and is most suspicious for active multiple sclerosis". There were "normal orbits, optic nerves, and optic chiasm, with demyelinating lesion along with the right trigone which could affect the optic tract and could cause a left-sided homonymous hemianopsia", but would need to "be confirmed with ophthalmologic visual field defect evaluation" (Exh. 1F/12).[6]

The claimant also had an MRI of the cervical spine on March 4, 2014, that showed multiple foci of abnormal signal in the cervical cord, most consistent with demyelination plaque. There was also mild to moderate volume central disc extrusion at C5-C6 with small disc protrusion at C3-C4 (Exh. 1F/05). The claimant also showed mild thoracic spine degenerative changes (Exh. 1F/06).[7]

On September 20, 2014, the claimant presented to the emergency department with chest pain that was persistent from the previous night to presentation (Exh. 2F/06). Her physical exam showed no abnormalities and her cardiac enzyme blood work was normal, as was her chest x-ray (Exh. 2F/06-07). She was discharged with instructions to use an albuterol inhaler for an upper respiratory infection (Exh. 2F/07).

---

[6] This brain MRI was performed at the Community Hospital in McCook, Nebraska; the stated reason for the MRI was "R/O COMPRESSION LESION, VISION LOSS ESP RT EYE" (Filing 14-7, p. 12).

[7] These spinal MRIs were actually performed on November 28, 2014, at the McCook Community Hospital, as ordered by Davakumaran J. Kumar, M.D., a neurologist who practices in North Platte, Nebraska; the stated reason for both MRIs was "MULTIPLE SCLEROSIS" (Filing 14-7, pp. 5-7). Dr. Kumar first saw Plaintiff on November 19, 2014, on referral from David Powell, PA-C. At that time, Plaintiff reported that the onset of muscle weakness had been occurring in an intermittent pattern for 10 years, but had been increasing over the past year; that she had difficulty rising from a chair, climbing stairs, combing her hair, walking, and writing; that she had increased weakness after exertion; that the muscle weakness was located over her entire body, but was worst in her hands and feet; and that she experienced muscle twitching, numbness in her hands and legs, and tingling (Filing 14-7, p. 70). On physical examination, Plaintiff had normal lower arm strength but reduced strength (4/5) in both legs; impaired sensory level at T4; deep brisk tendon reflexes; equivocal plantar reflexes; and an unsteady gait but no ataxia (Filing 14-7, p. 71). In addition to ordering the spinal MRIs, Dr. Kumar referred Plaintiff to a physical therapist (Filing 14-7, p. 72).

On December 17, 2014, the claimant presented to Anil Kumar, M.D., for an exam due to numbness in the legs and hands (Exh. 4F/06). The claimant's physical exam showed she could get in and out of a chair with minimal support and overall her gait was stable and she could walk with minimal assistance (Exh. 4F/06). Her deep tendon reflexes were brisk throughout and her upper extremity strength was full (Exh. 4F/06). Her lower extremity strength was only slightly reduced and she had good sensation in most areas (Exh. 4F/06).[8]

On November 25, 2014, the claimant presented to Steven Thompson, P.T., stating she was "pretty sure that she has MS and just has not gotten the official diagnosis yet" (Exh. 1F/07). The claimant ambulated with a cane with a neurologically weak type gait pattern but could rise and sit 10 times in 30 seconds from a seated position (Exh. 1F/07). She was able to complete single leg stances for 16 seconds (Exh. 1F/07).

On December 2, 2014, the claimant presented to the emergency department with shortness of breath (Exh. 2F/01). She stated she was 13 weeks pregnant and had multiple sclerosis (Exh. 2F/01). The claimant's physical exam showed that her lungs were clear to auscultation anteriorly and posteriorly bilaterally (Exh. 2F/01). The claimant's chest x-ray was normal and the remainder of her physical exam showed she had no other abnormalities in her mouth, nose, or throat (Exh. 2F/01). The claimant was instructed to stop smoking, eat regular meals, drink enough fluid, and take her prenatal vitamins (Exh. 2F/02).

The claimant's physical exam with Dr. [Anil] Kumar on January 12, 2015, showed she had a broad based gait and used a cane (Exh. 4F/10). She showed either full or nearly full strength in the lower extremities which was

---

[8] Dr. Anil Kumar is a neurologist and a colleague of Davakumaran J. Kumar, M.D. Plaintiff reported that her symptoms had gotten worse since her last visit to the clinic on November 19, 2014, with increased numbness in her left hand and more problems with balance and movement; Plaintiff stated she had been doing PT twice a week (Filing 14-7, p. 73). Before seeing Plaintiff, Dr. Anil Kumar consulted with Rana K. Zabad, M.D., a neurologist specializing in treatment of MS at the University of Nebraska Medical Center (Nebraska Medicine), who recommended starting Plaintiff on steroids or intravenous immunoglobulin (IVIG) if her symptoms were getting worse (Filing 14-7, p. 75). He also spoke to Plaintiff's OB-GYN, who approved the use of steroids if Plaintiff was having acute exacerbation of her MS (Filing 14-8, p. 8). Because Plaintiff's symptoms were found to be mildly improved (with no sensory level and strength in lower extremities increasing from 4/5 to +4/5), Dr. Kumar did not pursue this course of treatment (Filing 14-7, p. 75).

noted to be an improvement (Exh. 4F/10). The claimant showed impaired coordination in finger-to-nose testing but she showed full strength in her upper extremities with no pronator drift or tremor (Exh. 4F/10). The claimant was put on a conservative medication management program and she was noted to be improving in her symptoms (Exh. 4F/10).

On March 3, 2015, the claimant presented to Dr. [*sic*] Thompson for physical therapy ambulating with two canes but was recommended for crutches instead (Exh. 7F/01). The claimant's physical exam showed that her "gait is somewhat unsteady and she was characteristic lack of dorsiflexor strength and her feet tend to land very flat rather than with a normal heel toe type fashion" (Exh. 7F/01).[9]

The claimant reported [to PT Thompson] on March 12, 2015, that she was using crutches and they were "working much better for her" and she was able to complete 45 minutes of therapeutic exercise" (Exh. 7F/04).[10]

On March 18, 2015, the claimant presented to Rana Zabad, M.D., for management of her multiple sclerosis (Exh. 12F/01). The claimant reported that she had numbness and weakness in her upper extremities and was nine weeks pregnant (Exh. 12F/01).[11] Her physical exam showed that she had normal strength, bulk, and note in her arms her deep tendon reflexes were "pathologically brisk" (Exh. 12F/03). Her lower extremity strength showed

_____

[9] When Plaintiff visited the McCook Clinic on February 26, 2015, she "presented in a wheelchair" (Filing 14-10, p. 20). PA-C Powell noted Plaintiff had muscle weakness in the lower extremities (right 4/5, left 3+/5) and walking on heels was impaired (Filing 14-10, p. 21).

[10] The crutches were prescribed by a physician at the McCook Clinic on March 4, 2015 (Filing 14-10, p. 33).

[11] This is a misreading of the record. Dr. Zabad was merely summarizing Plaintiff's medical history in her notes, stating in part: "In 2014, [Plaintiff] went to see a PA for imbalance and numbness in her hands, from wrist down, worse distally. She found out she was 9-week[s] pregnant. She was referred to Dr. Kumar in December 2014. Currently she is still pregnant with an expected delivery date [of] June 12, 2015. She has been using BL [bilateral] crutches since 2/2015. They help her walking straighter." (Filing 14-10, p. 37) *See also* PAC Powell's office notes of November 3, 2014 (Filing 14-7, pp. 42-43) and notes of prenatal visit at McCook Clinic on November 14, 2014 (Filing 14-7, pp 38-41). Plaintiff told Dr. Zabad her symptoms were now "bad enough" that she was now willing to try disease modification treatment (DMT) (Filing 14-10, p. 37).

only a slight reduction in the right side hip flexors, knee flexors, and big toe extensors [4/5], but full strength in the knee extensors, dorsiflexors, and plantaflexors (Exh. 12F/03). The claimant had full strength in her left lower extremities in all areas (Exh. 12F/03). Her gait was broad based and she could not heel or toe walk and was considered a fall risk (Exh. 12F/03). The claimant use[d] crutches to walk[12] and her sensory exam showed subjective sensory loss in stocking and gloves (Exh. 12F/03). She was asked to return in three to six months (Exh. 12F/04).[13]

On July 10, 2015, the claimant presented for a MRI of the brain to be compared to her March 2014 MRI (Exh. 10F/16). The claimant had new focal areas of active demyelination involving the middle third of the right corona radiata and resolution of previous foci of active demyclination that were seen in March 2014 (Exh. 10F/17).

Then on July 10, 2015, the claimant had an MRI of the cervical spine that was also compared to earlier images (Exh. 10F/18). The claimant had no significant change from her prior image at the C5-C6 area, that showed focal central disc extrusion with moderate canal stenosis (Exh. 10F/19). The claimant had multifocal demyelinating disease throughout the cervical spinal cord as well as involving the structures in the posterior fossa and upper thoracic cord (Exh. 10F/19). The claimant had no new lesions and the pattern of disease had not significantly changed from her prior image (Exh. 10F/19).

On August 25, 2016, the claimant presented to the emergency department with complaints of pain after a fall (Exh. 10F/37). Her physical exam showed generalized tenderness all along the spine and paravertebrally (Exh. 10F/37). The claimant was noted to have excellent biceps, triceps, hand grasp strength as well as equal and strong reflexes (Exh. 10F/37). Her CT scan

---

[12] On examination by Dr. Zabad, however, Plaintiff "ambulated without her crutches" (Filing 14-10, p. 39). She could not toe, heel, or tandem walk. Plaintiff also tested Romberg positive (Filing 14-10, p. 39).

[13] Dr. Zabad assessed Plaintiff as having "[c]linically definite RRMS [relapsing-remitting MS] with very active disease and high burden of disease on the spinal cord and moderate on the brain" (Filing 14-10, p. 40). Dr. Zabad thought Plaintiff might benefit from intravenous solumedrol (IVSM) treatment; provided that an ultrasound of the fetus scheduled for the following week showed no congenital malformations, the Plaintiff could opt to be administered high dose steroids for 3 days at her local hospital or family physician's office in McCook; however, it was "explained to [Plaintiff] that in the postpartum period, she might go on to have another relapse" (Filing 14-10, p. 40).

of the cervical and thoracic spine showed no acute abnormalities (Exh. 10F/37). She was told to put ice packs on the sore areas, rest, and take over the counter medication for any pain (Exh. 10F/37).

On September 1, 2016, the claimant presented to David Powell, P.A.C., for an exam (Exh. 11F/11). The claimant had slightly reduced strength in her right lower extremity and moderately reduced strength in her left lower extremity (Exh. 11F/12). The claimant was noted to have a previous fall but Mr. Powell stated her "overall function is improving" (Exh. 11F/11).[14]

On September 21, 2016, the claimant had a MRI of the brain that showed multifocal white matter lesions consistent with the history of multiple sclerosis (Exh. 10F/41). There was an overall interval increase in number however. Although the previous right centrum semiovale enhancing lesions no longer enhance, there is a new enhancing left periventricular lesion (Exh. 10F/41).

_____

[14] Plaintiff reported "her overall function is improving since falling at home," but also stated her "leg weakness and numbness have gotten a lot worse since last visit" (Filing 14-10, p. 12). On examination, Plaintiff had 4/5 strength in both arms and 3+/5 strength in both legs; regarding coordination, PA-C Powell noted, "Pt unable to rise from wheelchair unassisted"; regarding gait, he noted, "Pt not able to walk unassisted, weakness is severe enough that not able to manage with cane, crutch or walker; and no musculoskeletal evaluation was made because "Pt presents in Wheel chair. Unable to stand or ambulate on her own power" (Filing 14-10, p. 13). Six months earlier, on April 7, 2016, PA-C Powell did not do strength testing and indicated he was unable to perform a musculoskeletal examination because Plaintiff presented in a wheelchair (Filing 14-10, p. 16). Plaintiff was next seen at the McCook Clinic on August 12, 2016, at which time she reported having fallen 3 days before; Plaintiff requested another referral for physical therapy and to be evaluated for a manual wheelchair (Filing 14-10, p. 14). Plaintiff's muscle strength was unchanged from the last visit and PA-C Powell noted that Plaintiff was unable to rise or walk without assistance (Filing 14-10, p. 15). He further noted: "Home Health has been notified. They will follow up on Monday. Pt is home bound due to MS, increasing weakness restricting mobility. Pt needs evaluation for bathing, meal prep and light house keeping" (Filing 14-10, p. 14). Plaintiff was referred to PT and "Started Wheelchair" (Filing 14-10, p. 15). Prior to the September 1, 2016 office visit, PA-C Powell spoke to an MS caseworker for Dr. Zabad about a plan to start Plaintiff on rituximab; he also spoke with Home Health and noted that Plaintiff was being fitted for a manual wheelchair (Filing 14-10, pp. 13, 27-28). On April 4, 2017, Plaintiff was seen by Alyssa B. Bauer, NP-C, at the McCook Clinic. Plaintiff complained of leg pain and increasing leg weakness over the past month; the nurse practitioner prescribed ropinorile for restless leg syndrome and was referring Plaintiff to Dr. Zabad or Dr. Kumar for follow-up (Filing 14-10, pp. 64-65).

The claimant had a stable focal lesion of the thoracic cord at T6-T7 but there was no abnormal enhancing lesions of the thoracic cord or vertebrae (Exh. 10F/44). She had a stable shallow disc protrusion at T7-T8 (Exh. 10F/44). A CT scan of her cervical spine diffuse abnormal signal throughout the entire cervical and upper thoracic cord with interval progression consistent with a history of multiple sclerosis (Exh. 10F/43). There was no abnormal enhancement (Exh. 10F/43). The claimant had moderate central disc protrusions at C3-C4 and C5-C6 causing mild to moderate central stenosis slightly progressed from the prior exam on July 10, 2015 (Exh. 10F/43).

On November 29, 2016, David Powell, stated the claimant "will be discharged from services on the 30th due to meeting goals and HH has not been able to get into the home for the past two weeks, [the claimant] did agree to services today and discharging on the 30th (Exh. 13F/05).[15]

On January 4, 2017, the claimant presented to Dr. Zabad for a follow up exam (Exh. 12F/17).[16] The claimant reported that she had a bowel movement every eight days and "she cannot walk" (Exh. 12F/17). The claimant reported "She cannot do anything" and "laying in bed she falls out" (Exh. 12F/17). Her physical exam showed that she had good vision and continued to have normal strength, bulk, and tone in her upper extremities (Exh. 12F/18). The claimant showed no changes in the deep tendon reflexes and a slight reduction in the strength of her lower extremities (Exh. 12F/19). Her gait was unchanged[17] and her coordination testing showed her foot tapping

---

[15] On January 3, 2017, PA-C Powell completed an incapacity statement for the Nebraska Department of Human Services, stating that Plaintiff should receive 24/7 child care services because of "Immobility secondary to MS. Pt. is wheel chair bound. Requires aid to transfer" (Filing 14-10, p. 35).

[16] Dr. Zabad noted that Plaintiff "has received her first dose of rituximab in August 2016" (Filing No. 14-10, p. 56). It was also noted that Plaintiff was previously prescribed Copaxone, but stopped taking it in April 2016 when she lost her insurance (Filing 14-10, p. 53). Plaintiff reported that her house was condemned following an electrical fire, and that she was no longer receiving physical therapy or home health services (Filing 14-10, p. 53). Dr. Zabad thought Plaintiff "definitely needs some physical therapy but unfortunately her life circumstance [very poor social support and poor finance] is a big impediment to proceed with that"; Dr. Zabad also opined that psychological stressors were likely contributing to Plaintiff's worsening MS (Filing 14-10, p. 56).

[17] Dr. Zabad noted: "Gait was broadbased. She cannot toe, heel or TW [tandem walk]. Romberg positive. Today she did not have her crutches. She was ambulating holding to the

was slower on the right than the left (Exh. 12F/19).[18] She was asked to return in three to four months (Exh. 12F/20).[19]

(Filing 14-2, pp. 27-29).

## IV. DISCUSSION

"By statute, '[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.'" *Howard v. Massanari*, 255 F.3d 577, 580 (8th Cir. 2001) (quoting 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that

---

walls. She was spastic parapetic worse on the left side. There was some slapping of the left foot." (Filing 14-10, p. 55)

[18] In addition, Plaintiff displayed bilateral dysmetria with heel-to-shin (HTS) testing and no rebound (Filing 14-10, p. 55). Dr. Zabad noted the same lack of coordination during previous exams (Filing 14-10, pp. 39, 46, 51).

[19] Although not discussed by the ALJ, Dr. Zabad also saw Plaintiff on December 1, 2015 (Filing 14-10, pp. 44-48), and again on April 5, 2016 (Filing 14-10, pp. 49-52). On the first of these visits, it was noted that glatiramer acetate (GA) therapy was initiated in September 2015, but Plaintiff had stopped taking the medication recently because it did not help and she had injection site reactions (Filing 14-10, p. 44). On examination, strength, bulk and tone were normal in Plaintiff's arms; leg strength was 4-/5 in both hip flexors, 4/5 in right knee flexor, 4/5 in right big toe extensor, 5-/5 in left big toe extensor, but otherwise normal; deep tendon reflexes were pathologically brisk; Plaintiff's gait was broadbased; she could not toe, heel, or tandem walk, was Romberg positive, and had bilateral foot drop; Plaintiff ambulated with her crutches but was considered a fall risk (Filing 14-10, p. 46). At the April 5, 2016 visit, Plaintiff reported "an increase in the frequency of falls. Her legs feel like dead weight. She reports constipation for more than a week followed by an explosive diarrhea." (Filing 14-10, p. 49) Dr. Zabad felt Plaintiff needed "aggressive treatment" with either rituximab or Lemtrada (Filing 14-10, p. 51). On examination, strength, bulk and tone were normal in Plaintiff's arms; leg strength was decreased to 3/5 in right hip flexor, but other measurements were unchanged (Filing 14-10, p. 50). Plaintiff's gait was also unchanged; she ambulated on crutches but was considered a fall risk (Filing 14-10, p. 50).

supports it." *Travis*, 477 F.3d at 1040. "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.*

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). No deference is owed to the Commissioner's legal conclusions. *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008) (stating that allegations of legal error are reviewed de novo).

"At step three [of the 5-step sequential analysis], the ALJ considers whether the claimant's severe impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1." *Scott v. Berryhill*, 855 F.3d 853, 855 (8th Cir. 2017); 20 C.F.R. § 416.920(a)(4)(iii). "If so, then the ALJ must find the claimant disabled." *Id.*; 20 C.F.R. § 404.1520(d). "[T]he listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "Thus, if the ALJ determines at step three of the sequential analysis that a claimant has a listed impairment, the claimant 'must be held disabled, and the case is over.'" *Brown v. Colvin*, 825 F.3d 936, 939 (8th Cir. 2016) (quoting *Jones v. Barnhart*, 335 F.3d 697, 699 (8th Cir. 2003)).

"The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing." *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*, 493 U.S. at 530-31). "To meet a listing, an impairment must meet all of the listing's specified criteria." *Id.*

The ALJ's decision in this case focused primarily upon whether Plaintiff's impairments met or medically equaled Listing 1.02 for major dysfunction of a joint or Listing 1.04 for disorders of the back. The ALJ determined that Listing 1.02 was not met or equaled because "the evidence does not demonstrate that the claimant has the degree of difficulty in performing fine and gross movements as defined in l.00B2c or the degree of difficulty in ambulating as defined in l.00B2b" (Filing 14-2, p. 24). The ALJ determined that Listing 1.04 was not met or equaled because "the medical evidence "does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis" and

"there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively, as defined in l.00B2b (Filing 14-2, p. 24). Plaintiff does not directly contest these findings.

Instead, Plaintiff complains that the ALJ gave inadequate consideration to Listing 11.09 for multiple sclerosis,[20] as he stated, without further explanation:

> The record does not show a disorganization of motor function as described in 11.04B; or a visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or a significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

(Filing 14-2, p. 25).

In making this finding, the ALJ referenced the language of a superseded version of Listing 11.09, which, before being replaced on September 29, 2016, had identified as a disabling condition:

> 11.09 Multiple sclerosis. With:

> A. Disorganization of motor function as described in 11.04B;[21] or

---

[20] "Multiple sclerosis (MS) is a chronic, inflammatory, degenerative disorder that damages the myelin sheath surrounding the nerve fibers in the brain and spinal cord. The damage disrupts the normal transmission of nerve impulses within the brain and between the brain and other parts of the body, causing impairment in muscle coordination, strength, balance, sensation, and vision. There are several forms of MS, ranging from mildly to highly aggressive. Milder forms generally involve acute attacks (exacerbations) with partial or complete recovery from signs and symptoms (remissions). Aggressive forms generally exhibit a steady progression of signs and symptoms with few or no remissions. The effects of all forms vary from person to person." 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00N1 (effective September 29, 2016).

[21] Section 11.04B defined the required motor function disorganization as "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." 20 C.F.R. Pt. 404, Subpart. P, App. 1, § 11.04B (in effect prior to September 29, 2016). Section 11.00C

B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or

C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.09 (in effect prior to Sept. 29, 2016).

The criteria in the Listing of Impairments that the Commissioner uses to evaluate disability claims involving neurological disorders, including multiple sclerosis, were revised comprehensively on July 1, 2016, with the new regulations taking effect on September 29, 2016, nearly 10 months before the ALJ's July 25, 2017 decision. *See Revised Medical Criteria for Evaluating Neurological Disorders*, 81 Fed. Reg. 43048, 2016 WL 3551949 (July 1, 2016). The revised listings apply to "new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." *Id.* at 43051.

Accordingly, the revised Listing 11.09 should have been used by the ALJ in the analysis of Plaintiff's claim, and it will be applied by the court in reviewing the ALJ's decision. *See id.* at 43051 n. 6 ("This means that we will use the final rule[s] on and after their effective date in any case in which we make a determination or decision. We expect that Federal courts will review our final decisions using the rule[s] that were in effect at the time we issued the decisions."). The revised listing requires a finding of disability for a claimant who has:

11.09 Multiple sclerosis, characterized by A or B:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from

---

provided: "Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.00C (in effect prior to Sept. 29, 2016).

a seated position, balance while standing or walking, or use the upper extremities; or

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:
1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
2. Interacting with others (see 11.00G3b(ii)); or
3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § 404, Subpt. P, App. 1, § 11.09 (effective September 29, 2016).

Plaintiff contends a finding of disability is required under part A of this listing because she has disorganization of motor function in both lower extremities[22] resulting in an extreme limitation in her ability to stand up from a seated position or to balance while standing or walking.[23] To meet this Listing, Plaintiff must show either "that once seated [she] is unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes," 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00D2a (effective September 29, 2016), or else that she is "unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes," 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00D2b (effective September 29, 2016).

---

[22] "Disorganization of motor function means interference, due to [a] neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders)." 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00D1 (effective September 29, 2016). The affected extremities may include "both lower extremities, or both upper extremities, or one upper extremity and one lower extremity." *Id.*

[23] "Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use [the] upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders)."20 C.F.R. § 404, Subpt. P, App. 1, § 11.00D2 (effective September 29, 2016).

Although the ALJ in this case merely stated his conclusion the Plaintiff's MS symptoms were not sufficiently severe to meet the requirements of Listing 11.09, the Eighth Circuit has held that "[a]n ALJ's failure to address a specific listing or to elaborate on his conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion." *Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017) (citing *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006); *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003)); *see also Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.").[24] However, "[r]emand is warranted 'where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [the court] to conclude that substantial evidence supports the Commissioner's decision." *Id.* (quoting *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008)).

Here, the ALJ concluded that Listing 11.09 was not met because "[t]he record does not show a disorganization of motor function as described in 11.04B" (Filing 14-2, p. 25). Former section 11.04B described the disorganization of motor function as being "significant and persistent" and "resulting in sustained disturbance of gross and dexterous movements, or gait and station." *See* 20 C.F.R. Pt. 404, Subpart. P, App. 1, § 11.04B (in effect prior to September 29, 2016). The ALJ's decision gives no indication that he considered Plaintiff's disorganization of motor function to be insignificant or non-persistent. The ALJ instead appears to have concluded that Plaintiff's MS did not cause a sustained disturbance of her gait and station – in other words, there was not a sufficient degree of interference with her ability to walk and stand. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 11.00C (in effect prior to Sept. 29, 2016).

---

[24] Similarly, the fact that the ALJ discussed Plaintiff's medical evidence only in conjunction with his RFC determination does not necessarily imply that his step-three determination was flawed. *See Vance v. Colvin*, No. 8:15CV115, 2016 WL 225665, at *3 (D. Neb. Jan. 19, 2016) ("The fact that the ALJ's actual discussion of the medical evidence came later in the opinion was most likely motivated by a desire not to be redundant in his writing, especially in light of the overlapping nature of the medical evidence.... The ALJ stated that he had considered the medical evidence when evaluating the Listings. The fact that his actual discussion of the medical evidence came later in the opinion is of no real significance under the circumstances here."), *aff'd sub nom. Vance v. Berryhill*, 860 F.3d 1114 (8th Cir. 2017).

Under the regulations in effect at the time the ALJ rendered his decision, such a determination would require a finding that Plaintiff failed to establish she required assistance (of another person or use of an assistive device such as a walker, two crutches, or two canes) either to stand upright from a seated position or to remain upright while standing or walking. *See* 20 C.F.R. § 404, Subpt. P, App. 1, § 11.00D (effective September 29, 2016).

In evaluating multiple sclerosis under Listing 11.09, the Commissioner considers a claimant's "signs and symptoms, such as flaccidity, spasticity, spasms, incoordination, imbalance, tremor, physical fatigue, muscle weakness, dizziness, tingling, and numbness when ... determin[ing] [his or her] ability to stand up, balance, walk, or perform fine and gross motor movements. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.00N2 (effective September 29, 2016). "Symptoms" are the claimant's "own description of [his or her] physical or mental impairment." 20 C.F.R. § 416.902(n). "Signs" are "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 416.902(l).

Social Security Ruling 16-3p, which applies to cases decided after March 28, 2016, states that "if an individual alleges impairment-related symptoms, [the ALJ] must evaluate those symptoms using a two-step process set forth in [the] regulations." SSR 16-3p, *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 2017 WL 5180304, at *2 (Oct. 25, 2017) (footnote omitted); *see* 20 C.F.R. § 416.929. "First, [the ALJ] must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities ...." *Id.* at 49463, 2017 WL 5180304, at *3.

"To decide whether the impairment meets the level of severity described in a listed impairment, [the ALJ] will consider an individual's symptoms when a symptom(s) is one of the criteria in a listing to ensure the symptom is present in combination with the other criteria.... Unless the listing states otherwise, it is not necessary [for the claimant] to provide

information about the intensity, persistence, or limiting effects of a symptom as long as all other findings required by the specific listing are present." *Id.* at 49467, 2017 WL 5180304, at *11 (footnote omitted); *see* 20 C.F.R. § 416.929(d)(2).

Social Security Ruling 16-3p also specifies that the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*, 2017 WL 5180304, at *10. "In evaluating an individual's symptoms, it is not sufficient for [the ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [the ALJ] simply to recite the factors described in the regulations for evaluating symptoms." *Id.*

The ALJ in this case stated that "the claimant's allegations and symptoms have been evaluated" under SSR 16-3p (Filing 14-2, p. 31). The ALJ summarized Plaintiff's testimony and concluded that her symptoms and claimed limitations were not supported by the medical record:

The claimant alleged to the State agency that she was disabled due to multiple sclerosis (Exh. 2E/2).[25] The claimant alleged that she was "very limited" and during a normal day she would "wake up, crawl to kids to get 'em up for school" (Exh. 4E/01).[26] The claimant stated her "legs aren't awake at 6am" and then will sit on the couch to wait for kids rides to show up (Exh. 4E/01). The claimant stated she was not taking any medications but then reported she was still looking for medication that helped and did not have side effects (Exh. 4E/04). The claimant stated she used to go outside on her own but no longer does because she is too weak and will fall (Exh. 4E/04). The claimant stated she had numbness, fatigue, weakness, dizziness, blurred or double fusion, and a slow thought processes (Exh. 4E/03). She stated she could not sit for more than 20 minutes at a time, walk 20 feet with a cane, could not stand without a cane, and could not tie her six-year-old's shoes (Exh. 4E/02).

---

[25] Exhibit 2E is a disability report dated February 5, 2015.

[26] Exhibit 4E is a daily activities and symptoms report dated February 19, 2015.

The claimant testified she had an increase in symptoms and was in a wheelchair at the hearing. She testified she had recently given birth and that she lacked the strength to hold the infant in her lap.[27] None of the records even hints that she lacks the strength to do that. Those types of erroneous statement [*sic*] detract from the reliability of her testimony.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce at least some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

* * *

Under SSR 16-3p, the claimant's allegations and symptom evaluation have been evaluated. The undersigned has evaluated the claimant's limitations that are relevant to the claims made, and assessed the intensity, persistence, and limiting effects of the individual's symptoms. While the claimant has made allegations of being unable to walk, her exams, including the most recent exams, showed that she had only slightly reduced strength in her lower extremities and full strength in her upper extremities (Exh. 12F/06-17).[28]

The claimant also used a wheelchair but there is no indication that it was prescribed by a medical source. The claimant testified she needed to go

---

[27] Plaintiff's testimony concerned a child who was born in November 2013 (see Filing 14-7, p. 52), and who was nearly 3½ years old at the time of the hearing on April 24, 2017. (Plaintiff's attorney mistakenly stated the child was born in November 2014, at which time Plaintiff was pregnant with her fifth child.) Plaintiff testified she experienced arm weakness after the birth of her fourth child and needed to hold onto furniture when walking. Plaintiff also testified the wheelchair made it easier to care for her youngest child, who was born in June 2015, because she was able to hold him in her arms, feed him a bottle, and change his diaper. (Filing 14-2, pp. 52-54, 58-59)

[28] Exhibit 12F/06-17 includes Dr. Zabad's progress notes for Plaintiff's office visits on March 18, 2015, December 1, 2015, April 5, 2016, and January 4, 2017 (Filing 14-10, pp. 44-53), and the record of a maternal fetal medicine consult at Nebraska Medicine on May 7, 2015 (Filing 14-10, pp. 41-43).

to the bathroom every 20 minutes but then told her doctor she goes to the restroom every eight days (Exh. 12F/17).[29]

At the hearing, she testified that she can perform a sedentary job, if not her inability to know when she needed to use the restroom.[30]

Her inconsistencies in the usage of a wheelchair when compared to her objective physical exams casts doubt on her overall presentation. The claimant's allegations she was medically disabled is not consistent with the medical evidence of record. The detailed analysis above shows the longitudinal history of the claimant's treatment, showing that she has been able to perform work within the residual functional capacity. The objective medical evidence does not support the claimant's alleged symptoms of or its limiting effects. The claimant's exams are inconsistent with the claimant's allegations of disabling symptoms. The objective imaging and exams show that the claimant had only mild impairment (Exh. 10F/17, 41).[31] She has also shown

---

[29] Plaintiff actually told Dr. Zabad on January 4, 2017, that "[s]he has a bowel movement every 8 days" (Filing 14-10, p. 53). Similarly, on April 5, 2016, Plaintiff reported to Dr. Zabad that she has "constipation for more than a week followed by explosive diarrhea" (Filing 14-10, p. 49). On December 1, 2015, Plaintiff told Dr. Zabad "[s]he has bladder urgency and incontinence," but "was not constipated" (Filing 14-10, p. 44). When Plaintiff first saw Dr. Zabad on March 18, 2015, it was noted that she had bladder urgency, incomplete sensation, and incontinence (Filing 14-10, p. 37). Plaintiff testified at the hearing that she goes the bathroom every 20 minutes to avoid accidents because "I can feel once I'm close to urinating, I can feel that I have to but I don't feel it until right when it's coming" (Filing 14-2, pp. 63-64).

[30] The ALJ asked Plaintiff if she would be able to work as a security guard, sitting at a desk and checking IDs as people entered a building. Plaintiff indicated she needs frequent restroom breaks and also needs to transfer from her wheelchair into a lift chair every hour to raise her feet in order to prevent swelling. (Filing 14-2, pp. 73-74)

[31] Exhibit 10F/17 is the report on a brain MRI that was performed on July 10, 2015. It found "[n]ew focal areas of active demyelination involving the middle third of the right corona radiata" and "[r]esolution of previous foci of active demyelination seen on 3/4/2014 (Filing 14-9, p. 18). Exhibit 10F/41 is the report on a brain MRI that was performed on September 21, 2016. It showed "mild cerebral atrophy without significant change" from the previous MRI, but an "[o]verall increase in the number" of lesions (Filing 14-9, pp. 41-42).

good response to treatment, resulting in a wider residual functional capacity (Exh. 4F/06-10).[32]

While the claimant has otherwise alleged she is unable to work, the limitations evidenced by the objective medical record do not support these allegations. The claimant described the alleged symptoms and limitations at the hearing in a manner that is not consistent with the medical record. The limitations found by the providers during the exams in the record are consistent with the ability to perform work related activities. The exams show that she retained good strength, range of motion, and sensation (Exh. 4F/06-10; 12F/19).[33] Therefore, when the entirety of the claimant's record is assessed, the claimant's case has not been presented in a way that allows for a finding that they were disabled.

(Filing 14-2, pp. 26-27, 30-31)

The ALJ determined that Plaintiff's use of a wheelchair was inconsistent with her physical exams, which "showed that she had only slightly reduced strength in her lower extremities and full strength in her upper extremities" (Filing 14-2, p. 30). However, those physical exams also showed that Plaintiff had a broad-based gait, could not toe, heel, or tandem walk, was Romberg positive, and was considered a fall risk. *See* Dr. Zabad's progress notes (Filing 14-10, pp. 39, 46, 50, 55). Other coordination issues were also noted. Viewing the record as a whole, the ALJ's focus on muscle strength was misplaced. *See, e.g., Monhart v. Comm'r of Soc. Sec.*, No. 1:17 CV 790, 2018 WL 3772732, at *8 (N.D. Ohio Aug. 9, 2018) (holding that ALJ's "reliance on muscle strength testing to undermine findings of muscle coordination is inapposite," and remanding for reconsideration by Commissioner of whether claimant's MS met Listing 11.09A).

The ALJ also found that Plaintiff's use of a wheelchair "casts doubt on her overall presentation." Such a credibility determination runs counter to the Commissioner's directive that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." SSR 16-3p, 82 Fed. Reg. at 49467, 2017 WL

---

[32] Exhibit 4F/6-10 includes Dr. Anid Kumar's office notes regarding his examination of Plaintiff on December 17, 2014, and January 11, 2015 (Filing 14-7, pp. 75-79).

[33] Exhibit 12F/19 includes results of Dr. Zabad's examination of Plaintiff on January 4, 2017 (Filing 14-10, p. 55).

5180304, at *2. "Rather, [the ALJ] will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities ...." *Id.*

In addition, the ALJ observed that "there is no indication that [the wheelchair] was prescribed by a medical source" (Filing 14-2, p. 30). Regardless of whether a script was written, the record shows that the McCook Clinic was instrumental in getting Plaintiff fitted for a manual wheelchair in August 2016 (Filing 14-10, pp. 13-14, 27-28). The record also shows that a physician at the McCook Clinic prescribed crutches for Plaintiff in March 2015 (Filing 14-10, p. 33). The crutches had been recommended by Plaintiff's physical therapist because Plaintiff was having difficulty walking with two canes (Filing 14-8, p. 20).

Referencing brain MRIs that were performed in July 2015 and September 2016, the ALJ concluded that "objective imaging and exams show that [Plaintiff] had only mild impairment" (Filing 14-2, p. 31). But when the neurologist, Dr. Zabad, reviewed the first of these MRIs with Plaintiff on April 5, 2016, her assessment was "[c]linically definite RRMS with very active disease and high burden of disease on the spinal cord and moderate on the brain" (Filing 14-10, p. 51). Dr. Zabad had made the same assessment on March 18, 2015, when she reviewed the brain MRI that was performed in March 2014 (Filing 14-10, p. 40). Comparing the MRIs, Dr. Zabad noted that the July 2015 brain MRI showed "3 new CEL [contrast-enhancing lesions]" since March 2014 (Filing 14-10, p. 51). The September 2016 brain MRI, which was ordered by Dr. Zabad, also showed an "[o]verall increase in the number" of lesions as compared to the July 2015 brain MRI (Filing 14-9, pp. 41-42). "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966 (7th Cir.1996).

Next, referencing Dr. Anid Kumar's examinations of Plaintiff on December 17, 2014, and January 11, 2015, the ALJ determined that Plaintiff "has also shown good response to treatment" (Filing 14-2, p. 31). While Plaintiff's condition had improved since she was examined by Dr. Davakumaran J. Kumar on November 19, 2014, and showed additional

-23-

improvement since Dr. Anid Kumar's first examination, the record does not show Plaintiff was receiving any treatment other than physical therapy during this period of time.

It must also be noted that Plaintiff has been diagnosed with relapsing-remitting MS, which the ALJ seems not to have taken into account. "Courts have long recognized that multiple sclerosis is a progressive disease for which there is no cure and which is subject to periods of remission and exacerbation." *Tyser v. Astrue*, No. 4:09CV3078, 2010 WL 2541255, at \*10 (D. Neb. June 17, 2010).

> While multiple sclerosis is not *per se* disabling, the ALJ in evaluating a claimant with MS must consider "the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." [*Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir.1990)]. Since at least 1984, the Social Security regulations have recognize that "[i]n conditions which are episodic in character, such as multiple sclerosis ... consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, § 11.00(D). Thus, "'[w]hen a claimant with multiple sclerosis applies for social security benefits, it is error to focus on periods of remission from the disease to determine whether the claimant has the ability to engage in substantial gainful employment .'" *Hopkins v. Commissioner of Social Sec.*, 2009 WL 1360222 at \*16, Case No. 1:07-cv-964 (S.D. Ohio May 14, 2009) (quoting *Jones v. Secretary of HHS*, 35 F.3d 566 (6th Cir.1994) (unpublished)).

*Id.* (reversing and remanding for award of benefits after finding the ALJ failed to consider the progressive nature of plaintiff's MS and improperly focused on periods of remission).

Finally, again referencing Dr. Anid Kumar's office notes and also the results of Dr. Zabad's examination of Plaintiff on January 4, 2017, the ALJ found "exams show that [Plaintiff] retained good strength, range of motion, and sensation" (Filing 14-2, p. 31). When Dr. Kumar saw Plaintiff on January 12, 2015, she was walking with the help of a cane (Filing 14-7, p. 79). At the office visit to Dr. Zabad two years later, Plaintiff, who was without her crutches, ambulated by holding onto the wall, was spastic parapetic, worse on the left side, and had some slapping of the left foot" (Filing 14-10, p. 55). Dr. Zabad also noted on examination, as she had previously, that Plaintiff displayed bilateral dysmetria with heel-to-shin (HTS) testing and no rebound (Filing 14-10, p. 55).

After examining Plaintiff's testimony, the ALJ turned to a discussion of medical opinions, giving "little weight" to a "multiple sclerosis medical source statement" that was provided by Plaintiff's treating physician at the McCook Clinic in April 2017, "some weight" to the opinions of the state agency physicians who reviewed Plaintiff's medical records through February 2015, and "scant weight" to the January 2017 "incapacity statement" PA-C Powell provided to the Nebraska Department of Human Services. No opinions were sought from any of the treating neurologists. The ALJ stated:

> As for the opinion evidence, on April 13, 2017 the claimant's treating doctor, Mark Serbousek, M.D., submitted an incomplete and contradictory statement on the claimant's abilities (Exh. 14F/1).[34] The undersigned gives many of those conclusions little weight. He writes his conclusion that she is "wheelchair bound" and cannot stand more than five minutes, but there is no testing or exams by Dr. Serbousek to corroborate this finding. He provides no factual support for those conclusions. He has no basis for concluding she can stand no more than five minutes. He has no way of knowing that other than what she may have told him. There has been no testing to find that the claimant is was [*sic*] unable to stand beyond the five minute limit or unable to walk with a cane, these assertions when considered with the lack of testing, indicate a heavy reliance on the claimant's reporting rather than the objective testing done during exams.

> Similarly, he concludes that the claimant would be off task 25 percent or more during a normal workday, but there is no mention of any concentration, persistence or pace difficulties in the exam notes and the claimant showed no problems in these areas during the hearing (Exh. 14F/01-04). There is no apparent factual foundation for any of his opinions and he did not provide any. Finally, there are several areas that are "unknown" to Dr. Serbousek, including if there was any reproducible fatigue of motor function with substantial muscle weakness (Exh. 14F/02).

> Looking at the State agency findings, at the initial level, State agency medical consultant, Arthur Weaver, D.O., found the claimant had a severe impairment due to multiple sclerosis (Exh. 1A/05). Dr. Weaver stated the claimant could occasionally lift and carry 20 pounds and frequently carry 10 pounds. The claimant could sit for six hours in an eight-hour workday and stand and/or walk for six hours in an eight-hour workday. The claimant's

---

[34] This medical source statement was signed by both Dr. Serbousek and his physicians assistant, David Powell (Filing 14-10, p. 73).

limitations on pushing or pulling were the same as the ability to lift and carry but she may use a cane to assist in balancing but it was not required for ambulation (Exh. 1A/06). The claimant could occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds (Exh. 1A/06). She could occasionally balance, stoop, kneel, crouch, and crawl (Exh. 1A/07). The claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards (Exh. 1A/07).

At the reconsideration level, Jerry Reed, M.D., another State agency medical consultant, found the same severe impairment and affirmed the physical residual functional capacity as written at the initial level (Exh. 3A/07).

These findings are given some weight. There has [*sic*] been additional physical exams and objective imaging that was not available to those consultants and, obviously, was not considered during their evaluations. To the extent the above residual functional capacity varies from these opinions, this variation is attributable to the testimony and additional evidence that was not yet available to the State agency medical consultants.[35]

The undersigned gives scant weight to medical opinions of David Powell, P.A.C. who stated the claimant would need childcare 24 hours a day, seven days a week because she was incapacitated (Exh. 11F/34).[36] Statements that a claimant is "disabled", "unable to work", can or cannot perform a past job, meets a Listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability. Opinions on issues reserved to the Commissioner, such as those of the doctors reported above, can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are

---

[35] The state agency medical consultants determined that Plaintiff could perform light work (*i.e.*, she could lift no more than 20 pounds at a time and frequently lift or carry objects weighing up to 10 pounds). *See* 20 C.F.R. § 416.967(b). The ALJ determined that Plaintiff was limited to sedentary work (*i.e.*, she could lift no more than 10 pounds at a time and occasionally lift or carry articles like docket files, ledgers, and small tools). *See* 20 C.F.R. § 416.967(a). The ALJ also specified that Plaintiff would require the use of a cane but could continue the normal job duties, including the lifting and carrying of objects.

[36] Exhibit 11F/34 is the incapacity statement PA-C Powell prepared for the Nebraska Department of Health and Human services on January 3, 2017 (Filing 14-10, p. 35).

supported by the record as a whole or contradicted by persuasive evidence (20 CFR 404.1527(d)(2) and Social Security Ruling 96-Sp.).

(Filing 14-2, pp. 30-31)

The medical source statement (Exhibit 14F/01) that Plaintiff's counsel submitted to the McCook Clinic asked: "Does your patient have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station?" Dr. Serbousek and PA-C Powell answered in the affirmative and explained: "Pt wheelchair bound. Has functional use of upper extremities." (Filing 14-10, p. 70) Similarly, in the statement PA-C Powell completed for the Nebraska Department of Health and Human Services in January 2017 (Exhibit 14F/34), he checked a box to indicate Plaintiff was incapacitated (defined as having "any physical or mental illness, impairment or defect which is so severe as to eliminate the caretaker's ability to provide care for his/her children") and explained that Plaintiff is restricted by "[i]mmobility secondary to MS," such that she "is wheel chair bound" and [r]equires aid to transfer" (Filing 14-10, p. 35).

"Whether the findings for an individual's impairment meet the requirements of an impairment in the listings is usually more a question of medical fact than a question of medical opinion. Many of the criteria in the listings relate to the nature and severity of impairments; e.g., diagnosis, prognosis and, for those listings that include such criteria, symptoms and functional limitations. In most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation. To the extent that a treating source is usually the best source of this documentation, the adjudicator looks to the treating source for medical evidence with which he or she can determine whether an individual's impairment meets a listing. *When a treating source provides medical evidence that demonstrates that an individual has an impairment that meets a listing, and the treating source offers an opinion that is consistent with this evidence, the adjudicator's administrative finding about whether the individual's impairment(s) meets the requirements of a listing will generally agree with the treating source's opinion.* Nevertheless, the issue of meeting the requirements of a listing is still an issue ultimately reserved to the Commissioner." SSR 96-5P, *Titles II & XVI: Med.*

*Source Opinions on Issues Reserved to the Comm'r*, 61 Fed. Reg. 34471, 34473, 1996 WL 374183, at *3 (S.S.A. July 2, 1996) (emphasis supplied); *see* 20 C.F.R. § 416.927.[37]

"Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." *Id.*, 1996 WL 374183, at *2. "Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings" is one such issue. *Id.* "Nevertheless, [the Commissioner's] rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner." *Id.* "Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion." *Id.* at 344474, 1996 WL 374183, at *6.

The ALJ identified Dr. Serbousek as a treating source, but did not specifically discuss his opinion that Plaintiff has "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station." Instead, the ALJ stated there were "no testing or exams by Dr. Serbousek" to corroborate "his conclusion that [Plaintiff] is 'wheelchair bound' and cannot stand more than five minutes," or that Plaintiff is "unable to stand beyond the five minute limit or unable to walk with a cane." The ALJ inferred there was "heavy reliance on the [Plaintiff's] reporting rather than the objective testing done during exams." The ALJ does not appear to have made any effort to contact Dr. Serbousek for clarification of the reasons for his opinion that Plaintiff's impairments met the level of severity for Listing 11.09A (under the version of the listing that was referenced in the ALJ's decision).

---

[37] Social Security Ruling 96-5p has been rescinded, effective for claims filed on or after March 27, 2017, as being inconsistent with *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017). *See Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p*, 82 Fed. Reg. 15,263, 2017 WL 1105348 (Mar. 27, 2017). This ruling still applies to Plaintiff's claim, however.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (citations omitted). "The ALJ's duty to develop the record extends even to cases ... where an attorney represented the claimant at the administrative hearing." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).

The ALJ's decision elsewhere mentions that Plaintiff was seen by PA-C Powell on September 1, 2016, but no reference is made to his notations that on examination, Plaintiff was "unable to rise from wheelchair unassisted" and "not able to walk unassisted," with her "weakness ... severe enough that [she is] not able to manage with cane, crutch or walker" (Filing 14-10, pp. 13, 15). The ALJ's decision also makes no reference to PA-C Powell's examination of Plaintiff on April 7, 2016, when she presented in a wheelchair (Filing 14-10, p. 16), or to his examination of Plaintiff on August 12, 2016, when it was noted that Plaintiff was unable to rise or walk without assistance (Filing 14-10, p. 15). In addition, there is no mention that PA-C Powell's treatment plan on August 12, 2016, included the notation, "Started Wheelchair" (Filing 14-10, p. 15).

Although a physicians assistant is not an "acceptable medical source" under the Commissioner's regulations, *see* 20 C.F.R. § 416.902(a), "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p, 61 Fed. Reg. at 34472, 1996 WL 374183, at *3. "The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." *Id.*

The Commissioner's regulations also provide that "[t]he adjudicator generally should explain the weight given to opinions from [medical sources who are not acceptable medical sources] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(1). In this case, the ALJ gave "scant" weight to PA-C Powell's opinion that

Plaintiff is "wheel chair bound" simply because he checked a box indicating that Plaintiff was "incapacitated" for purposes of receiving child care.

## V. CONCLUSION

For the various reasons discussed above, the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ did not make a proper assessment at step three of the 5-step sequential analysis as to whether the Plaintiff's severe impairment meets or equals Listing 11.09A. This finding makes it unnecessary to discuss alleged errors occurring at steps four and five. Because the case will be remanded for reconsideration, it is also unnecessary to discuss Plaintiff's constitutional challenge to the ALJ's authority to adjudicate her claim, or the Commissioner's waiver argument. *See, e.g., Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8 (D. Neb. Dec. 6, 2018) (noting that claimant could reassert Appointments Clause claim on remand, and Commissioner could decide whether to assign a different ALJ to the case).

Accordingly,

IT IS ORDERED that the decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and the case is remanded for further proceedings consistent with the foregoing opinion. Final judgment will be entered by separate document.

March 25, 2019                                    BY THE COURT:

                                                  s/ *Richard G. Kopf*
                                                  Senior United States District Judge